UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

HAROLD WAYNE BARNES, Jr.,                                    PLAINTIFF

v.                                          CIVIL ACTION NO. 3:13-CV-00525-DJH

CSXT TRANSPORTATION, INC.,                                   DEFENDANT

**<u>ORDER</u>**

This matter is before the Magistrate Judge to consider the renewed motion of Defendant,

CSXT Transportation, Inc. (CSXT) to strike the 4 experts identified by the Plaintiff, Harold

Wayne Barnes, Jr.[1] CSXT requests that the experts, two vocational experts employed by the

Kentucky Office for the Blind (OFB)[2], Barnes' treating optometrist[3] and his treating

psychologist,[4] be excluded from providing expert testimony based on the alleged failure of

Barnes to provide expert reports in accordance with Rule 26(a)(2)(B) of the Federal Rules of

Civil Procedure.  CSXT insists that these individuals are subject to the full reporting requirement

for "retained or specially employed" witnesses because their opinions exceed their personal

knowledge and were developed in anticipation of litigation, notwithstanding Barnes' ongoing

claim that all of the witnesses fall within the "treating physician" exception to Rule 26(a)(2)(B).

Because examination of the record, along with the cited legal authorities, readily persuades the

Court that all four witnesses easily fit within the above exception, and because Barnes has

---

[1] (DN 60, Defendant's Renewed Motion to Strike; DN 71, Defendant's Response to Plaintiff's Supplemental
Memorandum in Opposition to Motion to Strike).

[2] Craig Callihan, MRC, CRC, Vocational Rehabilitation Counselor, and Andre Ryssemus, MRC, CRC, Assistive
Technology Specialist.  Commonwealth of Kentucky, Education and Work Force Development Cabinet, Office for
the Blind, Lexington, Kentucky

[3] Dr. John Musick, O.D., F.A.A.O., Nicholasville, Kentucky.

[4] Dr.  Marc Plavin, Ph, Behavioral Health and Wellness, Lexington, Kentucky.

provided CSXT with more than adequate timely, summary disclosures under Rule 26(a)(2)(C), the Motion to Strike is **DENIED** in its entirety for the reasons more fully set forth below.

# I.
## The Material Facts

Harold Wayne "Bud" Barnes, Jr., is a former employee of CSXT.  From 1997 until 2006, Barnes, a resident of Harrison County, Kentucky, held various positions with CSXT including for a number of years the position of "Yardmaster" at the Osborne train yard (Osborne Yard) located in Louisville, Kentucky, a job that he performed until 2004.  Unfortunately, two years later in May of 2006, while Barnes was working as a manager of field investigations for CSXT, he and his daughter were involved in a serious automobile accident, which led to damage to his optic nerve, an incurable condition diagnosed by his treating optometrist, Dr. John Musick, O.D., as optic atrophy.[5]

Treatment notes of Dr. Musick dated July 6, 2006 reflect Barnes' complaints of decreased vision and frequent headaches following the accident.[6] Visual acuity testing by the doctor on that occasion revealed 20/200 best vision in both Barnes' eyes.  Barnes in the Health History Questionnaire he completed for Dr. Musick on the same date in 2006 also revealed a psychiatric history of depression.[7] Visual field testing of Barnes' eyes performed by Dr. Musick in June of 2011 confirmed the diagnosis, but also demonstrated that Barnes met the visual field requirements to operate an automobile using a bioptic assistive device.[8]

---

[5] (DN 70, Treatment Records of Dr. Musick,pp. 1-58, Bates Nos. HB 1166-1223) (Sealed).
[6] (Id. at HB 1205).
[7] (Id. at HB 1203).
[8] (Id at HB 1193-1200).

After Barnes expressed an interest in driving an automobile, engaging in more family activities and possibly returning to work at CSXT, Dr. Musick referred him to the OFB.[9] Case Progress Records of July 7, 2011 reflect that Barnes initially met with vocational rehabilitation counselor Craig Callihan of the OFB in Lexington, Kentucky after being referred by Dr. Musick for participation in its bioptic driving program.[10] Dr. Musick provided the OFB with treatment records that confirmed the vision diagnosis of optic atrophy related to a traumatic brain injury incurred in the 2006 automobile accident.[11] Counselor Callihan's hand-written progress notes of the same 2011 date indicate that

> With Barnes' vision impairment, he is unable to drive a vehicle unless he receives a bioptic device, specialized training and a bioptic driving license.  He has significant difficulty reading the computer screen and cannot read standard [ ] without magnification.  His best corrected visual acuities are 20/200 both eyes. Bud is very eager to return to work.

(DN 62, Response, Exh.  13, Case Progress Record of July 7, 2011, Bates No. CSXT 002369). Barnes on that occasion expressed his confidence that he could return to his previous railroad job with assistive visual devices such as computer magnification software, CCTV and the bioptic device.[12] Two months later, in September 2011, Callihan prepared a bioptic driving referral and authorized Dr. Musick to receive a bioptic device.[13]

Barnes subsequently applied for re-employment at CSXT and in early August 2012 was contacted by Fred Crane, a Vocational Rehabilitation Counselor from the medical department of

---

[9] (DN 62, Response to Renewed Motion to Strike, Exh. 13, Case Progress Record of July 7, 2011, Bates No. CSXT 002368).

[10] (DN 62, Response to Motion to Strike, Exh. 13, Case Progress Record of July 7, 2011, Bates No. CSXT 002369).

[11] Id.

[12] Id.

[13] Id. at Bates No. CSXT002368.

CSX Transportation, to arrange a conference call between the two men and Craig Callihan on August 6, 2012.[14] During the call on August 6, Crane explained that the job of Yardmaster at Louisville would involve the use of 3-4 computer monitors that display different types of information.[15] Crane requested Callihan's opinion during their conversation on whether Barnes had the ability to perform this function.  Callihan explained that certain computer screen magnifying software programs existed, but that he and his OFB co-worker, Andre Ryssemus, Assistive Technology Specialist, would need to examine the work environment and the task demands at the Louisville Yard in order to determine what "AT" [assistive technology] to recommend and determine if it would enable Barnes to perform the duties of the Yardmaster job.[16]

OFB Case notes dated two days later on August 8, 2012, reflect that Callihan received a call from Barnes to advise that Fred Crane of CSXT had requested that he take a vision color test and a visual field test with the results to be sent to Crane in Jacksonville, Florida.[17] Barnes, according to Callihan, related that when he first started employment with CSXT he had already been diagnosed with optic atrophy. Callihan spoke with Dr. Musick's assistant to explain Barnes' situation and to arrange an appointment with the doctor for testing.[18]

The next day on August 9, 2012, Callihan received a call from Fred Crane at CSXT.[19] Crane explained to Callihan that" he had spoken with two supervisors at the Louisville CSXT

---

[14] Id. at Bates No. CSXT002361.

[15] Id.

[16] Id. at Bates Nos. CSXT T002360-1.

[17] Id.

[18] Id. at Bates No. CSXT T002360.

[19] Id.

operation, both of whom have expressed reservation about Barnes being able to work there because of vision concerns."[20] Crane advised Callihan that in one location at the Osborne Yard there were six computer monitors on the Yardmaster's desk.  Some of these monitors displayed color-coded schematics of the train tracks in the yard that use different colors to indicate the current status of the tracks at any given moment.[21] Accordingly, Crane expressed concern about Barnes' color vision perception problems and about computer monitor screen magnification, concerns which Crane explained caused the Chief Medical Officer for CSXT, Dr. Nielsen, to request that Barnes have a visual field test and a color vision test.[22]

Dr. Musick administered visual testing to Barnes that same month and reported the results to Callihan at the OFB on August 28, 2012.  Callihan's progress notes indicate that he immediately provided a copy of the doctor's report to Crane who had received it by August 30. The report of Dr. Musick revealed that Barnes had a field of vision of 120° and could distinguish between the colors red, green and amber.[23] These results according to the same progress notes led the CSXT Chief Medical Officer to request a meeting with Callihan, Ryssemus, Crane and another CSXT manager in Louisville at the Osborne Yard "to make sure whether accommodations can be made in the work environment which can meet the needs of a person with a visual impairment." [24]

Crane advised Callihan during their conversation on August 30 that CSXT currently had three open Yardmaster positions, but Barnes would be required to "qualify, or be able to

---

[20] Id. at Bates No. CSXT T002359.
[21] Id.

[22] Id.

[23] Id. at Bates No.  CSXT002358.

[24] Id.

function, in at least two of the three" positions, all of which involve the use of computer displays, and two of which also required the Yardmaster to personally overlook the train tracks on the yard through office windows.  Crane told Callihan that CSXT wanted to be sure that Barnes could clearly see all of these computer monitors.[25]

On September 20, 2012, Callihan and his co-worker, Ryssemus, met with Fred Crane and Don McCog, the Assistant Terminal Superintendent at the Osborne Yard in Louisville.  Neither Barnes nor any attorney participated in this work site visit. Callihan's progress notes of the same date reflect that the group toured three different Yardmaster workstations (the "Hump Tower," "Bowl Tower" and "Mapother Tower")[26] at the Osborne Yard; and, Callihan and Ryssemus discussed their observations with Crane, whose "role/responsibility," Callihan wrote, "is to determine, with input from OFB, if Bud (this consumer) can return to full employment with CSXT in a Yardmaster position or possibly in a different position."[27] Callihan's notes then add that, "the probable next step is to have Bud complete the Ishihara color vision test by Dr. John Music or his staff; subsequent decisions by CSXT would be based on the outcome of that test, according to Mr. Crane."[28]

The following day on September 21, 2012, Crane contacted Callihan by email to provide a copy of the Ishihara color vision test and to advise that he had spoken with Dr. Nielsen, Chief Medical Officer for CSXT, who Crane related had advised that the color vision test "could result in a 'go/no go' decision."[29] Three days later on September 24 Callihan's notes indicate that, after

---

[25] Id.

[26]  Id. at Bates CSXT 002392-002396).

[27] Id. at Bates No.  CSXT002357.

[28] Id.

[29] Id at Bates No. CSXT002357.

speaking with the eye doctor's assistant, he faxed the color vision test form to Dr. Musick.[30] Barnes took the vision test at Dr. Musick's office and reported back to Callihan on September 28 that he had failed the test.[31]

Barnes also reported on that occasion that he had received assurances that his union would support any appeal he took if he was denied re-employment by the CSXT medical department.  Callihan at that time discussed with Barnes the duties and environment of the Yardmaster job at the Osborne Yard.  Barnes expressed the opinion that he would have "no real problem with the tasks," but the two men agreed that he would need to have some assistive devices in order to read the computer monitors located in the Yardmaster's office.[32]

This sequence of events led OFB employee Andre Ryssemus to prepare an Assistive Technology Services Evaluation Report dated October 8, 2012.[33] The 3-page Report indicated that Barnes had stopped by the OFB office six days earlier on October 2 to examine various magnification devices that could assist him "in getting back into a previous position of Yard Master he once held."[34] Ryssemus explained in his Report that "the concerns that our office has from a visual perspective was [sic] color desertion, being able to look at various monitors simultaneously as well as viewing out into "the bowl" and the safety of the crew under the watch."[35]

---

[30] Id. at Bates No. CSXT002356.

[31] Id.

[32] Id.

[33] Id. at Bates No. CSXT 002397.

[34] Id.

[35] Id.

The remainder of the Evaluation Report prepared by Ryssemus contains a detailed review of all of the work-related visual issues anticipated at the three Yardmaster workstations located at the Osborne Yard.  It reflects that Ryssemus and Barnes not only discussed these work performance issues, i.e., adequately reading computer monitors and print materials, but also tested various visual assistive devices such as the Ruby Handheld magnifier and Da Vinci, Eschbach Detail and MaxTV glasses.  Using these devices, Barnes, according to Ryssemus "was able to view both the monitor and various print materials on our walls with minimal effort."[36] Barnes further advised Ryssemus that he would use binoculars to view objects located in the "bowl area" of the train yard.

Ryssemus concluded the body of the report by noting that Barnes was eager to get back to work and felt that he could perform the essential functions of the Yardmaster position with minimal accommodation, which he believed that he could prove to CSXT through its simulation program that he can do the job.[37] Ryssemus therefore recommended, based on his interaction with Barnes, that the OFB order the Ruby Handheld magnifier and Da Vinci Eschbach visual aid system.[38] Despite Barnes eagerness to return to work, CSXT denied his application for re-employment as Yardmaster, which led Barnes to file an administrative charge of disability discrimination with the EEOC on October 15, 2012.

On February 11, 2013, Callihan and Ryssemus prepared a detailed letter report on official OFB stationary addressed to Fred Crane at CSXT[39] In their report, the two men related that Barnes had been in the OFB office on January 7, 2013 to try out "several different low vision

---

[36] Id. at Bates No. CSXT 002398.

[37] Id.

[38] Id at Bates No. CSXT 002399.

[39] (DN 62,Exh.  6, February 11, 2013 letter to Fred Crane at Bates Nos. CSXT 002500-002501).

devices for near and distant viewing."[40] While they conceded that none of the OFB staff are opticians or optometrists, and that they did not have the capability to duplicate the physical environment of the Yardmaster workstations at the Osborne Yard, Callihan and Ryssemus nonetheless were able to report that using a combination of the visual assistive devices "Barnes was able to read near-, mid- and far-distance objects."[41]

Specifically, using the Eschenbach Max Detail glasses within a Windows 7 environment on a 24" monitor, Barnes was reported to be "able to function well in navigating around the computer screen desktop and various software programs."[42] With the AiSquared Zoom Text screen magnification software at 3-4X magnification with negative contrast, Barnes was noted to be able to read material in an Arial 8pt font.  When Barnes used the Eschenbach Max TV glasses at +3 dpf, Callihan and Ryssemus reported that, he was "able to view and describe to us various shapes and lettering within 25 feet" and "was able to read the awning of an auto body shop approximately one block away as well as a sign painted on the door of a pickup truck at a distance of approximately 50 yards with the use of his bioptic telescope."

In their report, they advised that "Barnes performed well with the hand-held CCTV magnifiers such as the Freedom Scientific Ruby and the HIMS Lifestyle Candy using the negative contrast at various magnification levels."[43] Finally, Barnes also was noted to do well with the Enhanced Vision Da Vinci CCTV as a standalone desktop magnification unit, again

---

[40] Id.
[41] Id.

[42] Id.

[43] Id.

being able to read Arial 8pt font.[44] Callihan and Ryssemus concluded their letter report with the

following summation:

> In summary, with either a handheld or desktop CCTV magnifier, he is able to easily read handwritten or print documents. With some magnifying eyeglasses, he is able to read the computer screen. Any accessibility features available in the software or operating systems, along with larger computer monitors, would be helpful. With the bioptic device he uses for driving, he was able to read various items of signage stated and that with continued practice  he will be able to use the device  for spot checking areas on the yard. Incidentally, we observed no symptoms of eye fatigue while trying these devices at our office.
>
> From the experience at our office earlier this month, along with our earlier observations at the Osborne Yard, it is the opinion of the undersigned that with the proper assistive devices Mr. Barnes can carry out the essential job functions of a railroad yardmaster. Although we recognize his capability in completing the outlined job tasks as we have evaluated, there are always in every job, instances beyond control that occur. We are offering our professional opinion on behalf of our consumer and realize the ultimate decision on employment will depend on CSXT.

(DN 62, Exh.  6, February 11, 2013 letter to Fred Crane at Bates CSXT 002500-002501.)

Three months later on May 24, 2013, Barnes filed his present suit against CXST in

federal court.[45] In his complaint, Barnes alleged that CSXT violated the Americans with

Disabilities Act (ADA), 42 U.S.C. § 12111 *et seq*. and the Kentucky Civil Rights Act (KCRA),

KRS § 344.040 when it denied his 2012 application for re-employment as Yardmaster due to his

vision impairment, despite his prior employment with CSXT in the same position with the same

optic atrophy condition, and his ability to perform the essential functions of the Yardmaster job

with reasonable accommodation.  Ten months after Barnes brought suit, in February 2014, he re-

established contact with Lexington licensed psychologist, Marc Plavin, Ph.D., of the Behavioral

Health & Wellness Center, PSC.

---

[44] Id.
[45] (DN 1, Complaint).

Barnes originally began treatment with Plavin's practice partner, psychiatrist Dr. Ila Patel, six years prior on March 5, 2008, when he appeared before Dr. Patel for medication review, following referral by his psychotherapist.  Barnes presented with complaints of ongoing depression and related symptoms of worthlessness, insomnia, irritability, suicidal thoughts and nightmares attributed to his May 2006 automobile accident, which he reported had led him originally to begin therapy in June 2006.[46]

Dr. Patel's impression on that date was that Barnes had "suffered significant vision loss and depression with recurrent nightmares about the accident and periodic flashbacks, anxiety and panic attacks. Due to his being not able to work he feels hopeless, helpless and feels like he is not a productive member of society."[47] Dr. Patel diagnosed "Major Depression, Severe; PTSD, Chronic" along with blindness, neck and back pain, and headache.[48] Dr. Marc Plavin performed his own initial psychological evaluation of Barnes the following month on April 11, 2008, which resulted in a treatment report containing the same subjective complaints, medical history and diagnostic impressions.[49]

A review of Dr. Plavin's treatment notes reflects that Barnes continued regular treatment with Dr. Plavin, usually on a monthly, and sometimes bi-weekly, basis throughout 2008, 2009 and more sporadically in 2010.[50] The doctor's notes contain multiple references to sadness, worry and anxiety related to Barnes' accident-related physical, mental and employment

---

[46] (DN 70, Psychiatric Associates, PSC treatment notes Harold Barnes dated 3/5/2008 at Bates HB 1294) (sealed).
[47] Id.

[48] Id. at Bates HB 1295-96.

[49] Id. at Bates HB 1297-98.

[50] Id. at Bates HB 1297-1316.

problems, along with his prior dispute involving CSXT and his insurance company.[51] Dr. Plavin's notes from February 20, 2009 indicate that Barnes was "filing lawsuit today;"[52] however, notes from the following month correct that the lawsuit was "not filed as planned."[53]

Barnes continued to talk with Dr. Plavin about his desire to work and his struggles to accept his limitations.[54] Dr. Plavin's progress notes of May 11, 2009 indicate that the "case got filed" and "three [law] firms involved." [55] Two months later, on July 9, 2009, Barnes reported to Dr. Plavin that Barnes was "doing depositions, [and] IMEs."[56] Barnes was observed as being depressed and anxious with occasional suicidal thoughts.[57] As of August 25, 2009 Dr. Plavin's diagnosis remained PTSD, chronic.[58] December 16, 2009 progress notes of Dr. Plavin state that the "Case against the RR was dismissed in federal court. Appealing case."[59]

---

[51] Id.

[52] Id at Bates HB 1307. Treatment notes from September 9, 2008 appear to indicate that Barnes' spouse, Laurie, was upset that he "has no attorney." (Id. at Bates HB 1305). Two months later, on November 11, 2008 notes of Dr. Plavin state that Barnes "met w/attorney from Buffalo." (Id. at Bates HB 1306). The motion papers and accompanying record do not indicate that Barnes had prior counsel in his evolving dispute with CSXT, nor do the treatment records reveal the procedural status of such prior dispute at the time that he met with the attorney from Buffalo in November 2008. It is clear, however, that the treatment notes contain no mention that any attorney referred Barnes to psychotherapy in 2006 or to Dr. Plavin in 2008, or that any attorney requested any opinion of Dr. Plavin, or provided Plavin with any litigation-related information during this initial treatment period.

[53] Id. at Bates HB 1308.

[54] Id. at Bates HB 1310.

[55] Id. The "case" referred to in the notes of Dr. Plavin is apparently the  2009 case of *Barnes v. CSXTransportation, Inc.*, No. 2:09-cv-00058 (E.D. Ky. May 4, 2009) which according to CSXT involved a FELA claim by Barnes that CSXT failed to provide him with accomodations to address the legal blindness that resulted from his 2006 auto accident.

[56] Id. at Bates HB 1311.

[57] Id.

[58] Id.

[59] Id. at Bates HB 1313.

Barnes continued his psychiatric treatment with Dr. Plavin on three occasions in 2010 with little change in his complaints of depression, insomnia, frustration and nightmares.[60] On March 2, 2010, Plavin reported that an unnamed "judge said Bud had no case against CSX."[61] The following month on April 15, 2010, Barnes reported that his "own case [was] in appeals court in Cincy." Over a year later on July 18, 2011, Dr. Plavin's next note indicates that the doctor spoke with Barnes who then reported "great news" that he was able to drive using binocular equipment. Barnes thanked the Dr. for helping him and being supportive.[62] No further contact occurred between the two men until February 21, 2014, when Dr. Plavin's notes indicate that he again spoke with "Bud" who told the doctor that he would like to return for therapy.[63]

Barnes resumed active psychological treatment with Dr. Plavin on March 27, 2014.[64] Barnes on that date again related his May 5, 2006 automobile accident and resulting injuries, adding that he had been "fitted with special glasses and [was] now able to drive." Barnes told the doctor that the Office of the Blind was supporting his efforts to return to work, that he had his doctor's okay, "but CSX says no."[65] Barnes advised that he had "hired lawyers."[66] Dr. Plavin's initial visit notes reflect that Barnes still had some PTSD symptoms related to the accident, although his "physical issues from accident [were] somewhat improved" and that Barnes was "no longer taking medication for anxiety or depression."[67] In the section of the initial visit report

---

[60] Id.

[61] Id. at Bates HB 1314.

[62] Id.

[63] Id. at Bates HB 1315.

[64] Id. at Bates HB 1316.
[65] Id.

[66] Id.

[67] Id. at Bates HB 1317.

for "work history," Dr. Plavin noted that Barnes had worked for CSXT for many years in different capacities and wanted to return to work as yardmaster but CSXT would not make recommended accommodations.[68] Dr. Plavin diagnosed Depressive Disorder and PTSD, chronic.[69]

## II.
## Relevant Procedural History

During the events immediately above, Barnes and CSXT proceeded with their current federal litigation. The initial scheduling order of the District Court entered on September 30, 2013 established an expert witness deadline for the plaintiff of June 2, 2014.[70] This deadline subsequently was extended to August 4, 2014 on the motion of the Plaintiff for an extension of time to complete discovery.[71] CSXT then filed an unopposed motion to further amend/correct the amended scheduling order to extend its own time to disclose its expert witnesses to January 11, 2015 .[72] The District Court granted the motion by order September 22, 2014.[73] Exactly one week later, CSXT filed its first motion to strike the Plaintiff's identified experts on September 29.[74]

---

[68] Id.

[69] Id at Bates HB 1319. Nowhere in this final treatment note of record is there any mention that Barnes was referred or urged by his current counsel, or any other attorney, to resume treatment in 2014, nor is there any mention that Barnes' counsel then provided or requested information or opinions from Dr. Plavin.

[70] (DN 13, Scheduling Order).

[71] (DN, 15, Motion for Extension of Time to Complete Discovery; DN 17, Order granting Motion DN 15).

[72] (DN 22, Unopposed Motion to Amend/Correct Scheduling Order).

[73] (DN 23, Order)

[74] (DN 24, Motion to Strike; DN 29, Response to Motion to Strike; DN 35, Reply). The District Court on December 11, 2014, pursuant to General Order 2014-14 reassigned the present case, which already once had been previously reassigned, to another District Judge for all further proceedings. (DN 36, Order of Case Reassignment). Following a telephonic status conference held on March 4, 2015 (DN 38, Order Granting Motion to Amend Scheduling Order),

Eight weeks earlier Barnes had on August 4, 2014 served CSXT with his "Firs[t]
Supplemental Response to Interrogatory Answers and Disclosure of Witnesses Providing FRE
702 Testimony."[75] The disclosure identified Callihan and Ryssemus, their employer, their
respective job titles, their office location, the general nature of their proposed expert testimony,
the factual basis for their anticipated testimony, and the Bates numbers for the specific treatment
records cited as support.[76] The same disclosure also identified by name optometrist, Dr. John
Musick and psychologist Dr. Marc Plavin, providing with respect to each man all of the same

the District Court entered a new scheduling order that established new discovery, dispositive motion and defense
expert witness deadlines.  In accordance with the May 22, 2015 deadline for CSXT to disclose its expert witnesses,
the Defendant filed its notice of expert witness disclosure on the deadline date.  (DN 45, Notice of Disclosure of
Expert Witnesses).

At the direction of the District Court, a settlement conference was held before the Magistrate Judge on June 25, 2015
without the parties reaching an informal resolution of their dispute.  (DN 47, Report of Settlement Conference).  The
Magistrate Judge stayed discovery and dispositive motion deadlines for 60 days at that time "to allow the parties to
explore options discussed during the settlement conference." (Id.). No general order of referral to the Magistrate
Judge pursuant to 28 U.S.C. § 626(b)(1)(A) and (B) was then in force.

[75] (DN 62, Plaintiffs Response to Renewed Motion to Strike, Exhibit 3).

[76] Id. Specifically, the Disclosure stated:
"(a) Each of these individuals [Callihan and Ryssemus] is expected to testify that there are assistive
devices that are reasonably available to assist Plaintiff in performing the essential functions of
yardmaster. They are expected to testify regarding the costs of such devices and their application
to Mr. Barnes visual impairments in the context of the Yard Master position with CSXT. Each is
expected to testify that, in his opinion, with the proper assistive devices that are reasonably
available, Mr. Barnes can carry out the essential job functions of a railroad Yardmaster at CSXT.

(b) The bases of the facts and opinions to be offered by these witnesses are set
out in the OFB records and the records of Dr. Musick. All of these have been previously
supplied to Defendants or obtained by Defendants in response to releases executed by Plaintiff.
In addition to the information contained in these records, it is anticipated that the above
individuals will also be relying on worksite inspections referenced in their records.

(c) Report - Both Mr. Callihan and Mr. Ryssemus are witnesses who will
provide both factual evidence, as well as testimony, under FRE 702, and have in fact already
prepared a report prior to the instigation of this lawsuit. The substance of their opinions are
contained in the OFB documents previously supplied, including their joint letter to CSX dated
February 11, 2003 (Bates No. CSXT 002500-2501) and related documents. The bases for the
opinions contained in that letter are included in the OFB records, Bates No. CSXT 002348-2558.

(d) The exhibits on which they are expected to rely include those same
records. In addition they may rely on the records of the Dr. Musick, Bates No. HB 1166-1214."

[subsections (e) and (f) omitted].

type of information that was provided concerning Callihan and Ryssemus, i.e., name, title, office

address, general nature of anticipated testimony, the factual basis for such testimony, citations to

specific Bates numbered documents for the supporting treatment records and disclaimer that no

Rule 26(a)(2)(B) report would be provided because the witness was not a retained expert but was

a treating provider for whom no arrangement had been made to provide compensation in

exchange for his anticipated testimony.[77] Barnes attached to his disclosure: the "Worksite

_____

[77] Id. The Disclosure stated as to Drs. Musick and Plavin:
"(a) Dr. Musick, is expected to testify regarding the results of various eye exams
of Plaintiff conducted by his office and will present his specific visual acuity findings
relating both to distance and near vision, the most recent of which is 07-25-13 and contained at
HB 1166-1170. He is also expected to testify regarding the results of various eye-exams relating
to the ability to Plaintiff discern colors and will present his specific color acuity findings, the
most recent of which is 12-18-13 and contained at HB 1171. He is expected to offer his opinion
that, with visual assistive devices provided to Plaintiff through the OFB, Plaintiff can meet visual
and color acuity requirements that are consistent with the requirements for Yard Master.

(b) The bases for his opinion, including the facts and data on which he is
expected to rely, are contained in Dr. Musick's medical records, including all eye exams, testing
and the results thereof as well as treatment provided by Dr. Musick. Those records on which he
is expected to rely and which contain the bases for and facts relative to his opinions have been
previously provided to Plaintiff and are found at Bates No. HB 1166-1214.

(c) Report – As Dr. Musick is not a retained expert he has not been asked to
prepare a report. However, the substance of the matters about which he is expected to testify can
be found in his records and the OFB records.

(d) The exhibits on which he is expected to rely include those same records.
In addition he may rely on the records of the OFB, Bates No. CSXT 002348-2558.

(e) Plaintiff will supply a list of credentials of Dr. Musick upon receipt of the
same.

(f) There is no arrangement to compensate Dr. Musick for his treatment of
Plaintiff as he is not a retained expert. Dr. Musick was compensated for his services as a treating
medical provider in the regular course of business.

4. Dr. Marc Plavin, Behavioral Health and Wellness, 3175 Custer Drive,
Lexington, Kentucky 40517, (859) 273-1288, will be called as a witness in this case and will be
offering opinion testimony under FRE Rule 702 consistent with his treatment, counseling, and
medical services he has been providing Plaintiff.

(a) Dr. Plavin, is expected to testify regarding the results of his treatment and
counseling of Plaintiff conducted at his office and will present his specific findings relating both
to issues of depression and anxiety. He is expected to offer his opinion that as a result of
Defendant CSX's actions in not allowing him to return to work, Plaintiff has suffered depression
and anxiety, which relates to his emotional distress.

16

observation/job analysis" report prepared by Callihan and Ryssemus based on their September 20, 2012 inspection of the Osborne Yard; the "Assistive Technology Services Evaluation Report" prepared by Ryssemus on October 2, 2012; and, the February 11, 2013 official letter of Callihan and Ryssemus to CSXT vocational rehabilitation specialist Fred Crane concerning assistive technology recommendations involving Barnes and their opinion of his ability to carry out the essential job functions of the railroad yardmaster with such devices.[78]

In mid-September 2014 counsel for CSXT and Barnes exchanged several email communications and telephone calls concerning the status of Barnes' identified experts with the dispute centered on whether the four witnesses were excluded from the full expert report requirements for a retained or specially employed expert witnesses under Rule 26(a)(2)(B) by operation of the "treating physician" exception and related provisions of Rule 26(a)(2)(C).[79] Examination of this exchange reveals that CSXT continued in its belief that the absence of any specific remuneration from Barnes to any of the four identified witnesses in exchange for their

---

(b) The bases for his opinion, including the facts and data on which he is expected to rely, are contained in Dr. Plavin's medical records as well as treatment provided by Dr. Plavin. Those records on which he is expected to rely and which contain the bases for and facts relative to his opinions will be acquired and supplemented to Defendant.

(c) Report – As Dr. Plavin is not a retained expert he has not been asked to prepare a report. However, the substance of the matters about which he is expected to testify can be found in his records.

(d) The exhibits on which he is expected to rely include those same records. In addition he may rely on the records of the OFB, Bates No. CSXT 002348-2558 and Dr. Musik records HB 1166-1214.

(e) Plaintiff will supply a list of credentials of Dr. Plavin upon receipt of the same.

(f) There is no arrangement to compensate Dr. Plavin for his treatment of Plaintiff as he is not a retained expert. Dr. Plavin was compensated for his services as a treating medical provider in the regular course of business."

[78] Id. at Bates CSXT002392-002399, CSXT 0025002501.

[79] (DN 62, response, Exh. 8, September 12, 2014 letter of M. Scott McIntyr;e; Exh. 9, September 26, 2014 letter of Michael O'Hara; Exhs. 10-12, September 29, 2014 email exchange of McIntyre and O'Hara).

anticipated opinions did not exempt the witnesses from the full expert report requirements of the Rule, given the ongoing belief of CSXT that each of the witnesses was testifying to matters beyond his own personal knowledge and supposedly had been specifically retained in anticipation of litigation.[80]

Following the administrative reassignment of the parties' case to the current District Court in late 2014, and the ensuing, unsuccessful efforts at settlement throughout summer and early fall of 2015, the Magistrate Judge conducted a telephonic status conference on September 1, 2015. The initial motion to strike the Plaintiff's identified experts was administratively remanded at that point without prejudice to CSXT to re-file.[81] Discovery at that time also remained stayed until the stay was lifted and CSXT granted leave by order entered on September 30, 2015 to refile its motion to strike.[82] After the parties re-filed their motions in October and November 2015,[83] The Magistrate Judge, following a telephonic conference on November 16, 2015, [84] again remanded the motion briefly while staying expert witness depositions pending the ultimate resolution of the motion to strike by the District Court.[85]

---

[80] (DN 62,Exh. 11, McIntyre email of September 29, 2014 at 11:50 5 AM) (citing in part, *Charles v. Print Fulfillment*, 2014 WL 16966 (W.D. Ky. Jan. 13, 2014); *Ulbrich v. UPR Products, Inc*., 2011 WL 500034 (E.D. Mich. Feb. 8, 2011); *Amos v. W.L. Plastics, Inc*., 2009 WL 3854980 (D. Utah, Nov. 17, 2009); and *Goodman v. Staples,* 644 F.3d 817 (9th Cir. 2011).

[81] (DN 50, Order).

[82] (DN 52, Order).

[83] (DN 60, Motion to Strike Plaintiffs Identified Experts; DN 62, Response to Motion to Strike; DN 63, Reply to Response).

[84] (DN 58, Text Order)

[85] (DN 59, Order).  Originally the referral order to the Magistrate Judge referred the case only for the purposes of settlement (DN 40, Order) not for consideration of the motion to strike.

In January and February 2016, the parties refiled their motion papers.[86]  The District Court later referred all nondispositive motions to the Magistrate Judge by Order of August 22, 2016.[87] On October 3, 2016 the Magistrate Judge ordered the parties to file supplemental memorandum of law.[88]  The Order in particular directed Barnes as follows:

> The [Plaintiff's Supplemental] Memorandum shall set forth in detail all of the opinions to be offered by each of the Plaintiff's four expert witnesses along with the facts and documents on which each such opinion is based. Plaintiff also shall include in the Memorandum citation to all case authority in support of its current position on the application of Rule 26(a)(2)(B) and (C)

(DN 67, Order of October 4, 2016, p. 1).

Barnes filed his supplemental memorandum and supporting documents in accordance with the direction of the court, and CSXT filed a timely supplemental response.[89] In compliance with the Order, Barnes set forth in his supplemental memorandum each of the anticipated opinions to be expressed by his four expert witnesses along with the basis for each such opinion and specific references to the Bates numbered documents offered in support of each opinion.[90]

## III.
## Arguments of the Movant

### A.

Throughout its ongoing efforts to strike Barnes' designated experts, the basic position of CSXT on the matter has remained constant.  Elaboration aside, CSXT insists that the full disclosure requirements of Rule 26(a)(2)(B) for retained or specially employed expert witnesses

---

[86] (DN 60, Motion to Strike; DN 62 Response; DN 63 Reply).
[87] (DN 64, Order of Referral).

[88] (DN 67, Order).

[89] (DN 68, Plaintiff's Supplemental Memorandum; DN 71, Response to Supplemental Memorandum).

[90] (DN 68, Supplemental Memorandum, pp. 2-10).

apply to all four of the identified individuals – – Callihan, Ryssemus, Drs. Musick and Plavin. CSXT rejects the notion offered by Barnes that all four men fit within the "treating physician" exception of Rule 26(a)(2)(C) merely because (1) each identified individual had a pre-existing professional relationship with him that began years before he filed his current complaint in May of 2013 and (2) none of them have been paid by Barnes in return for his anticipated testimony, as opposed to being compensated for his professional medical or vocational services. The critical consideration in the view of CSXT "is whether the proposed testimony of the expert . . . goes beyond his own personal knowledge and experience and/or . . . [was] developed in anticipation of litigation."[91] CSXT concludes that "the reality . . . [of] the broad, conclusory opinions set forth in [Barnes'] August 4, 2014 disclosures confirm[s] they are called upon to testify beyond their personal knowledge and/or in anticipation of litigation." Consequently, the ongoing refusal of Barnes to supply fully-compliant expert reports that satisfy all the criteria of Rule 26(a)(2)(B)(i)-(vi) justifies striking all four designated experts pursuant to the terms of Rule 37.

CSXT continues to explain that the legal conclusion of whether an individual can or cannot meet the essential functions of the job position of Yardmaster is just that – – a legal conclusion and not a proper subject for expert opinion testimony.[92] Further, to the extent that any identified expert would hope to offer such inappropriate testimony in the present case, CSXT adds that such an effort would not be based on his personal knowledge, but rather instead on "a review of information gleaned in this litigation."[93] Such opinions, according to CSXT, do not fall within the nature of information that a physician would normally obtain through his or her

---

[91] (DN 63, Reply in Support of Renewed Motion, p. 1).

[92] Id at p. 2

[93] Id.

required medical training, but rather falls closer to the type of causation testimony that "everyone agrees requires a report within the meaning of Rule 26(a)(2)(B)."[94]

To underscore the point, CSXT offers *Charles v. Print Fulfillment Services,* No. 3:11-CV-553-H, 2014 WL 169666 at *2 (W.D. Ky. Jan. 13, 2014) as an example of a situation in which a court ordered the production of full expert reports under Rule 26(a)(2)(B) even though certain of the "hybrid" expert opinions at issue were developed prior to the institution of litigation and not in anticipation of it. Because the default position under Rule 26(a)(2) is to require full expert reports, CSXT reasons, similar to *Print Fulfillment Services,* that the present Court should "err on the side of caution" and, given the adamant refusal of Barnes to comply with the Rule, strike his expert witnesses, none of whom comfortably fit within the category of a treating physician working to "heal the patient."[95]

CSXT offers a number of additional reasons for the requested relief. It points out first that Barnes in his Response to the Renewed Motion to Strike admits that at one point he previously explored using the testimony of a hired expert to offer the very same opinions he now insists are subject to the treating physician exception. If a retained expert was considered by Barnes to be the appropriate witness to offer such opinions, then it is difficult for CSXT to see how he can convince the Court that these same opinions now should be treated differently merely because Barnes hopes to assert them through the currently identified individuals.

Second, CSXT argues that Barnes' approach would turn the requirements of Rule 26(a)(2) on their head to encourage litigants to establish a pre-trial relationship with their expert witnesses solely in an effort to avoid the expert witness report requirements of Rule 26(a)(2)(B) just as Barnes himself has done. Barnes only explanation in this regard, according to CSXT, is

---

[94] Id.
[95] Id.

21

that he seeks to avoid the unstated costs of paying for his chosen experts to prepare their reports, an as-yet unquantified economic consideration that is legally irrelevant to the question of whether the reports must be produced in the first instance.

CSXT suspects that the true reason that Barnes has studiously avoided the expert report requirement has little to do with money, but rather the unavoidable reality that the production of expert reports under Rule 26(a)(2)(B) would reveal the inappropriately broad role he hopes his experts will take, given that absent such reports the Court and CSXT "will be forced to guess as to the expert's qualifications and whether any testimony they offer is within the realm of any expertise they may have . . . ."[96]

Without the required expert witness reports, and the vital information therein, CSXT concludes that it will be left with only further motion practice concerning the appropriate scope of the experts' opinions, while simultaneously being stymied in its efforts to complete expert depositions, which normally *follow* the production of expert witness reports, not *precede* them as Barnes seems to suggest, contrary to *R.C. Olstead, Inc v. CU Interface, LLC*, 606 F.3d 262, 271 (6th Cir. 2010)(expert witness reports under Rule 26(a)(2)(B)are required to prevent "ambush" litigation tactics during expert depositions).  What Barnes has produced to date is insufficient in the view of CSXT even to satisfy the summary expert report requirement of Rule 26(a)(2)(C) so that if the Court will not strike the expert's outright, it should at least compel Barnes to provide adequate Rule 26(a)(2)(c) summary reports and appropriately limit the testimony of his four experts to events up to October 3, 2012, the date on which CSXT declined to re-employ Barnes as Yardmaster at the Osborne Yard in Louisville. See, *Kristensen ex rel. Kristensen v. Spotnitz*, 3:09-CV-00084, 2011 WL 5320686 at *2 (W.D Va. June 3, 2011) (plaintiff's reference to voluminous medical records does not qualify as an adequate summary of facts and opinions);

---

[96] Id. at p. 4.

*Nicastle v. Adams Cty. Sheriff's Office*, No. 10-cv-00816, 2011 WL 1674954, at *1 (D. Colo. May 3, 2011)(same).

In its various motion papers, CSXT sites to a variety of federal court decisions in support of the fundamental arguments outlined above.  For example, CSXT explains that the existence of a pre-existing relationship as being secondary to the nature of the proposed testimony of the expert is supported not only by *Print Fulfillment Services* according to CSXT, but also by *Hinkle v. Ford Motor Co*., No. 3:11-24-DCR, 2013 WL 1992834 (E.D. Ky. May 13, 2013) and *Ridder v. City of Springfield*, No. 9503358, 1997 WL 117024, at *4 (6th Cir. Mar. 13, 1997).  The requirement of a full expert report when the opinion goes outside an expert's personal knowledge, or was formed in anticipation of litigation, likewise is supported in CSXT's view by *Fielden v. CSX Transp*., 482 F.3d 866, 871 (6th Cir. 2007) and *Ulbrick v. UPR Prods*., No. 08-cv-13764, 2011 WL 500034 (E.D. Mich. Feb. 8, 2011).  Finally, CSXT adds that *Print Fulfillment* and *UPR Products* hold that whether a party compensates an expert is not determinative of the question of whether that expert, by the very nature of his or her opinions, is considered to be "retained or specially employed to provide expert testimony in the case" under Rule 26(a)(2)(B).

CSXT in its Reply also observes that Barnes has failed to undermine, or otherwise dispute, its cited case authority of *Widhelm v. Walmart Stores, Inc*. 162 F RD 591, 592 (D Neb. 1995), which suggests that even a treating physician is required to provide a Rule 26(a)(2)(B) expert report when he testifies to the issue of disability arising from the impaired vision of his patient.  *Id.*  Barnes likewise, CSXT insists, does not dispute the proposition reflected in *Print Fulfillment,* 2014 WL 169666 at *2, that vocational experts such as Callihan and Ryssemus typically are required to provide full expert reports.

23

Such reports CSXT explains are particularly appropriate in the present instance where the two OFB experts routinely appear to rely on the records of "another expert as well as documents and job information received from CSXT" as fundamental support for their ultimate (and inappropriate) legal conclusion that Barnes could perform the essential functions of the Yardmaster position with reasonable accommodation.  CSXT in this respect protests that the OFB experts are quite similar to the expert in *Mohney v. USA, Hockey, Inc.*, 300 F.Supp.2d 556, 561 (N.D. Ohio 2004), a treating physician nonetheless who relied upon subsequently obtained information, the post-incident review of a videotape, to express an opinion that was not set forth in a Rule 26(a)(2)(B) expert witness report as required.  Because the anticipated opinions of the OFB experts are not similar to those, more limited opinions of a treating physician, but are based upon information obtained from other experts, in some instances after the critical October 3, 2012 date, CSXT renews its request for their exclusion as expert witnesses.

The same considerations apply with equal force to the anticipated opinions of Dr. Plavin, whom CSXT notes admittedly also has relied on statements from other experts in support of his proposed testimony concerning Barnes' emotional distress – – an occurrence that confirms to CSXT that the doctor was not acting as a treating physician to that extent as his testimony "is not limited to an evaluation of the plaintiff for the purpose of healing him."[97] Further, it is equally noteworthy according to CSXT that Barnes went without treatment by Dr. Plavin for over four years from early 2010 until 2014, the year *after* he filed the present suit in late May of 2013.

B.

---

[97] Id. at p. 14.

CSXT in its supplemental response[98] raises a number of new arguments based on the contents of Barnes' Supplemental Memorandum[99] and the anticipated expert opinions that he identified therein at pages 2-10.  For example, CSXT argues that Barnes, after unsuccessfully attempting to establish a "poverty exception" to the expert witness report requirement of Rule 26(a)(2)(B) now apparently seeks to concoct a new "government employee" exception to the report requirement for OFB employees Callihan and Ryssemus contrary to *In re Air Crash at Charlotte, N.C. on July 2, 1994*, 982 F. Supp. 1086 (D.S.C. 1997) (former employees of the NTSB who previously participated in air disaster investigation were not exempt from the expert report requirements).  CSXT strongly disputes the novel notion that Kentucky statutory law makes it impossible for state employees Callihan or Ryssemuss to comply with Rule 26(a)(2)(B).

Beyond the prospect of a newly created government employee exception, the Supplemental Memorandum of Barnes merely serves in the view of CSXT to highlight the ever-changing and often contradictory nature of the proposed expert opinions of Barnes' four experts. These opinions even in their most recent manifestation remain well beyond the underlying policy of the "treating physician" exception of Rule 26(a)(2)(C) according to CSXT.  They are instead broad testimony on the ultimate legal question of whether he remains capable of performing the essential functions of the Yardmaster position with or without reasonable accommodation.

Once again, CSXT insists that any such opinion testimony "is far more akin to causation testimony than typical "treating physician" testimony"[100] and strongly suggests that Barnes' experts have morphed from their claimed treating physician status into retained experts under Rule 26(a)(2)(B).  Because their anticipated testimony relies on after-the-fact analysis based on

---

[98] (DN 71, CSXT's  Response to Barnes' Supplemental Memorandum).

[99] (DN 68, Barnes' Supplemental Memorandum (sealed); DN 74 Redacted Supplemental Memorandum).

[100] (DN 71, Response at p. 3).

the review of information from other experts, all of the factors set forth in *Print Fulfillment* compel the common sense conclusion that the full expert witness report requirements are essential and remain unsatisfied to date, some 2.5 years later.  To hold otherwise, CSXT insists would exempt from the purview of Rule26(a)(2)(B) any proposed expert who merely happened to provide professional services to a party before suit was filed, irrespective of the fundamental nature of their testimony as ranging far beyond the course of the party's treatment.  Under such extraordinary circumstances the exception would swallow the Rule according to CSXT.

To complicate matters, Barnes in his Supplemental Memorandum appears to CSXT to reserve to himself the right for his expert witnesses to offer certain other, currently undescribed opinions based on future events.  This type of "moving target" approach simply confirms to CSXT that these experts in reality function as retained expert witnesses acting together in a "coordinated advocacy effort"[101] rather than treating professionals.  Otherwise, Barnes seems to CSXT to use his Supplement merely to rehash the same unpersuasive arguments that he has clung to throughout the proceedings contrary to the controlling judicial decisions of the federal courts of the Sixth Circuit such as *Fielden*, *Print Fulfillment, Mohney* previously cited by CSXT in its prior motion papers.

If that were not enough, CSXT notes that the recently revised opinions of Barnes' experts contained in his Supplemental Memorandum in certain instances exceed or conflict with prior versions of the experts anticipated opinion testimony.  For example, Barnes initially indicated in his August 4, 2014 disclosure that Dr. Musick would offer the opinion that Barnes can meet the visual and color acuity requirements of the Yardmaster job with the use of visual assistive devices.[102]  Now, more than two years later, none of the listed 14 opinions set forth in the

---

[101] Id. at p. 5.
[102] (DN 60 Response, Exh. 3).

Supplemental Memorandum includes the above-stated opinion of Dr. Musick. The result, according to CSXT, is that it simply is left to guess about the substance of the doctor's opinions, which Barnes appears to suggest are not limited to those set forth in the Supplemental Memorandum, but rather may include additional, presently unstated opinions acquired at some unknown future date.

The same type of conflicting statements, CSXT points out, arise with regard to the anticipated expert testimony of Dr. Plavin. Originally, Barnes indicated that Dr. Plavin would rely on the records of the OFB and Dr. Music to offer the opinion that his emotional distress was the result of CSXT's refusal to reemploy him. Now, Barnes, contrary to his earlier representation, appears to indicate in his Supplemental Memorandum that Dr. Plavin will more generally testify and focus on Barnes' auto accident and previous litigation with CSXT as the source of his emotional distress. Nowhere in the Supplemental Memorandum does Barnes appear to refer to the earlier referenced records of the OFB or those of Dr. Musick. According to CSXT, these examples highlight the type of dilemma it now faces, absent full expert witness reports, to anticipate the wide ranging and apparently ever-changing opinions of Barnes' expert witnesses. For these reasons CSXT reiterates that Drs. Plavin and Musick are no less retained experts for the purposes of report requirement of Rule 26(a)(2)(B) than Callihan or Ryssemus.

## IV.

### Legal Analysis

#### A.

The question of whether Barnes' four expert witnesses are "retained or specially employed to provide expert testimony in the case" is the critical issue for the purposes of CSXT's long-standing motion to strike. If the experts were retained or specially employed by

27

Barnes to testify, then he would be subject to the strict expert witness report requirements set forth in subsection (B) of the Rule below.  Because Barnes admittedly has not filed such expert reports, he would be potentially subject to the penalties of Rule 37(c) assuming the Court were to conclude that such reports are required under Rule 26(a)(2)(B) and that his failure to provide them was not substantially justified or otherwise harmless. If, however, the four experts do not fall within this category, but rather will testify as hybrid expert witnesses only to matters and opinions that they developed in the course of their professional interaction with Barnes, as he repeatedly claims, then Callihan,  Ryssemus, Dr. Musick and Dr. Plavin will be subject only to the less demanding summary report requirements of subsection (C) of the Rule, which Barnes claims that he has satisfied by his prior disclosures.

Resolution of this dispute is governed in whole by the language and case law of Rule 26(a)(2)(B) and (C), which provide that:

(**2**) *Disclosure of Expert Testimony*.
(**A**) *In General*. In addition to the disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705.

(**B**) *Witnesses Who Must Provide a Written Report*. Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report--prepared and signed by the witness--if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:

(**i**) a complete statement of all opinions the witness will express and the basis and reasons for them;
(**ii**) the facts or data considered by the witness in forming them;
(**iii**) any exhibits that will be used to summarize or support them;
(**iv**) the witness's qualifications, including a list of all publications authored in the previous 10 years;
(**v**) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
(**vi**) a statement of the compensation to be paid for the study and testimony in the case.

**(C)** *Witnesses Who Do Not Provide a Written Report*. Unless otherwise stipulated or ordered by the court, if the witness is not required to provide a written report, this disclosure must state:

**(i)** the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and
**(ii)** a summary of the facts and opinions to which the witness is expected to testify.

Fed. R. Civ. P. 26.[103]

Nowhere in the quoted language of the Rule is a definition of "retained or specially employed" to be found. *Amos v. W.L. Plastics, Inc.,* No. 2:07-CV-49 TS, 2009 WL 3854980 at *2 (D. Utah Nov. 17, 2009) ("The terms 'retained' and 'specially employed' are not defined by the Rule."). At best, it may be said with confidence based on the cited federal case law that the nonpayment of compensation to an expert witness who will testimony is not of itself determinative of the issue. *See, Charles v. Print Fulfillment Services, LLC,* No 3:11-CV-553-H, 2014 WL 169666 at *1 (W.D. Ky. Jan. 13, 2014)(" As a preliminary matter, the court concludes that the relevant question regarding the applicability of Rule 26(a)(2)(B), is not whether money has changed hands, or whether an employment relationship otherwise exists . . . .").

A number of other important factors also must be considered before the question of whether an expert witness falls within the scope of subsection (B), so as to be subject to the expert witness report requirement, or within the "treating physician" exception of subsection (C)

---

[103] For an explanation of the disclosure approach adopted by 1993 amendment to Rule 26(a)(2), see Charles Alan Wright, Arthur R Miller, 8A Federal Practice & Procedure §2031.1 (3d ed. 2016)(" As to any such prospective trial witness who is retained or specially employed to provide expert testimony, and also with regard to any regular employee of a party whose duties include regularly giving expert testimony, Rule 26(a)(2) calls for a report containing substantially more information than was required by the interrogatory authorized by the 1970 version of Rule 26(b)(4)(A). This report requirement does not apply to a regular employee of a party whose duties do not include giving expert testimony, or to others not specially retained to provide testimony in the case. Similarly, the requirement does not apply to fact witnesses even though their involvement in the events in suit, or testimony about those events, may depend on the witness's expertise. A frequent example is a treating physician, who would ordinarily be treated as a nonretained witness but give some testimony drawing on medical expertise.")(footnotes omitted).

for witnesses who do not provide a written report may be properly resolved. These factors, which are initially set out by the Sixth Circuit in *Fielden v. CSX Transp*. 482 F.3d at 870-73, include: (1) whether the alleged treating physician was retained to provide expert testimony; (2) whether the physician formed his or her opinions at the time of treatment or in anticipation of litigation; (3) whether the lack of a full expert report would implicate Rule 26's purposes of avoiding surprise and unnecessary depositions; (4) whether any expert opinion on causation was formed during the course of treatment; and (5) whether the claimed physician will testify to issues beyond those ordinarily present in his or her medical training. *See Jet vs. CSX Transportation Inc.*, No 2007-162 (WOB), 2009 WL 899626 at *3 (E.D. Ky. 2009) (discussing *Fielden*, 482 F.3d at 870-73). The determinative factor according to *Fielden* "is the scope of the proposed testimony, i.e., whether the physician formed his opinion as to causation as part of his diagnosis and treatment of the plaintiff based on what he learned through actual treatment and from the plaintiffs records up to and including that treatment. *Id.* at 871.

A more recent decision from our sister district court that aptly summarizes these considerations and their consequences is *Hinkle vs. Ford Motor Co*., No 3:11-24-DCR, 2013 WL 1992834 at *1-2 (E.D. Ky. May 13, 2013), which explains that:

**A. Retained Expert vs. Treating Physician**

A witness who is "retained or specially employed to provide expert testimony in the case" must provide a written report containing certain required disclosures. Fed.R.Civ.P. 26(a)(2)(B). However, for witnesses who are not required to file a written report, a disclosure must simply be made in accordance with the less onerous disclosure standard Rule 26(a)(2)(C).1 A treating physician is generally exempt from the written report requirement for expert testimony to the extent that his or her opinions were formed during the course of treatment. *See Fielden v. CSX Transp., Inc.*, 482 F.3d 866, 869 (6th Cir.2007); *see also Roberts v. Solideal Tire, Inc.*, 06–14–DLB, 2007 WL 2990536, at *4 (E.D.Ky. Oct.10, 2007). Further, the Advisory Committee Note to Rule 26 states that a "treating physician ... can be deposed or called to testify at trial without any requirement for a written report." *Fielden*, 482 F.3d at 869 (alteration in original).

\* \* \* \*

30

"Generally a treating physician can provide expert testimony regarding a patient's illness, the appropriate diagnosis, and the cause of the illness even if the physician is not among the world's foremost authorities." *Thomas v. Novartis Pharms. Corp.*, 443 F. App'x 58, 62 (6th Cir.2011). However, a treating physician is not permitted to testify to issues beyond those covered in ordinary medical training. *Fielden*, 482 F.3d at 871–72.

The Sixth Circuit has held that a treating physician can testify solely within the scope of his own diagnosis and treatment. *See Ridder v. City of Springfield*, 108 F.3d 1377 (Table), 1997 WL 117024, at *4 (6th Cir. Mar.13, 1997); *see also Fielden*, 482 F.3d at 871 ("The determinative issue is the scope of the proposed testimony." (internal quotation marks omitted)). Therefore, a Rule 26(a)(2)(B) report "is not required when a treating physician testifies within a permissive core on issues pertaining to treatment, based on what he or she learned through actual treatment and from the plaintiff's records up to and including that treatment." *Fielden*, 482 F.3d at 871. "Courts attempting to determine whether a physician's testimony regarding causation falls into this 'core' have considered factors such as: (1) whether the physician reached his conclusion at the time of treatment; (2) whether the opposing party would be surprised by the testimony; (3) whether the condition at issues leaves room for debate as to the specific ailment and its sources; (4) whether the physician relied upon ordinary medical training in drawing his conclusion; and (5) whether the physician will rely on tests, documents, books, videos, or other sources not relied upon during treatment." *Gaspar v. Dicks*, No. 08–13707, 2011 U.S. Dist. LEXIS 136571, at *11,2011 WL 5975061 (E.D.Mich. Nov. 29, 2011); *see also Gorajczyk v. City of St. Clair Shores,* No. 08–14764, 2010 U.S. Dist. LEXIS 83765, at *12–13,2010 WL 3245432 (E.D.Mich. Aug. 17, 2010).

*Id*.

It must also be noted that the treating physician exception, while denominated as such, is not limited solely to medical professionals. The federal courts have on multiple occasions found this exception of Rule 26(a)(2)(C) to be applicable to a wide variety of professionals who otherwise satisfy the factors set forth above. For example, the exception has been held to be applicable to computer engineers. *Linux One Inc. v. Inktomi Corp*, No C03-01598 JW, 2004 WL 5518163 (N.D. Ca. Aug. 26, 2004)( "Some courts extend the treating physicians rule ... to other experts whose opinion testimony is based on matters personally observed or experienced by them. Since by definition they are not 'retained or specially employed' to render an opinion, no

31

expert witness report is required.")(quoting *Sprague vs. Liberty Mut. Ins.Co.,* 177 F.R.D. 78, 81 (D.N.H. 1998)).

Even elevator employees involved in the remodeling of a historic hotel have been held to fall within the treating physician exception for expert witnesses when their anticipated testimony is based upon facts observed during the normal course of their remodeling duties, and includes their professional judgment based on such observed facts. *Burgundy Development, LLC v. The Latham Company, Inc.*, No.12-1387, 2012 WL 6674413 at *2 (E.D. La. Dec. 20, 2012). Architects and safety specialists likewise have been found to be exempt from the expert witness report requirement under the Rule. *Beech Grove Redevelopment, LLC vs. Carter & Sons Plumbing, Heating and Air conditioning, Inc*., No. 07-8446, 2009 WL 981724 (E.D. La. April 9, 2009) (architects and project engineers involved in the renovation of an apartment building were permitted to testify to their factual observations and professional analysis rendered during the renovation project and post-fire operations, despite lack of expert reports); *Eagle Services Corp. vs. H2O Industrial Services Inc*. No 2:02-CV-36-PRC, 2005 WL 5988646 at *4-5 (N.D. Ind. Sept. 30, 2005) (former employee of the Plaintiff who drafted its safety programs seven years prior to the institution of litigation during the limited time she was employed for that specific business purpose fell within the treating physician exception of Rule 26(a)(2)(C) where the nature of her expert testimony at trial would be directly related to her prior work as employee). Accordingly, OFB employees such as Callihan and Ryssemus cannot be perfunctorily excluded from consideration merely because their statutorily imposed duties under Ky. Rev. Stat.(KRS) § 163.470(10) and (12) focus on providing assistive devices, mobility training and work evaluation services for the legally blind in Kentucky.

**B**.

The Court has given careful consideration to all of the *Fielden* factors as they relate to Barnes' designated hybrid expert witnesses.  Virtually all of the five factors fall heavily in favor of Barnes' claim that none of these four individuals has been retained or specially employed to testify.  A careful review of the treatment records of the designated experts, along with the extensive case law cited by the parties, repeatedly confirms that Callihan, Ryssemus, Musick and Plavin all will testify to facts directly related to their respective treatment of Barnes along with their professional judgment and opinions formed at the time of his treatment by each of them.

Because each hybrid expert will testify "within a permissive core on issues pertaining to treatment, based on what he or she learned through actual treatment and from the plaintiff's records up to and including that treatment," *Fielden*, 482 F.3d at 871, all four individuals readily fit within the treating physician exception to the expert report requirement and therefor are subject only to the decidedly less stringent summary report requirement of Rule 26(a)(2)(C), which Barnes fully satisfied not only with his August 4, 2012 disclosures, but by the detailed list of anticipated expert testimony, and the factual basis for such, contained in his Supplemental Memorandum. CSXT's arguments to the contrary, though well-drafted, simply are not supported by the facts of record.

For example, Dr. Musick, O.D., began his treatment of Barnes in July 2006 mere months after Barnes automobile collision that May.  The treatment notes of Dr. Musick, which have been previously set out in detail in this Order, confirm that the doctor provided vision-related professional services such as visual field testing, visual acuity testing and color differentiation testing at various times throughout his treatment of Barnes in 2006, 2011 and 2012.  Nowhere in such treatment notes is there any indication that Barnes' attorney referred him to Dr. Musick,

that his attorney solicited any opinions from the doctor at any time or that he provided the doctor with any litigation-related information used by the doctor in any respect.

The proposed testimony of Dr. Musick set forth at pages 6-9 of Barnes' Supplemental Memorandum (DN 68) is based entirely on the doctor's examinations of Barnes and Barnes test results. CSXT has been supplied with all of Dr. Musick's treatment records following Barnes execution of a records release authorization. CSXT cannot persuasively claim any possible surprise from the anticipated testimony set forth in the Supplemental Memorandum. Indeed, CSXT has now had more than two years to prepare itself for the doctor's anticipated testimony.

Dr. Musick, who has not been paid for his testimony, as opposed to his medical services, appears to have relied entirely on his ordinary medical training in drawing his conclusions, as confirmed by his treatment notes and the test results mentioned above. There is no indication that he will rely upon any tests, documents, books, videos or other sources that he did not rely on during his many years of treatment of the Plaintiff. His anticipated testimony, as noted, appears to the Court to readily fall within the "permissive core on issues pertaining to treatment, based on what he . . . learned through actual treatment" of Barnes. *Hinkle,* 2013 WL 1992834 at *2 (citing *Fielden* 482 F.3d at 871).

The same conclusions hold true for clinical psychologist, Dr. Plavin. First, it should be noted that Barnes has a documented history of chronic depression, which he related in the Health History Questionnaire that he completed for Dr. Musick on July 6, 2006, nearly seven years prior to the institution of the present lawsuit in 2013. As the earlier portion of this Order noted, Barnes was referred to Dr. Plavin by Barnes' own treating psychotherapist in the early spring of 2008, some five years before the present lawsuit. These circumstances entirely undercut any suggestion that Barnes, in the some Machiavellian fashion, sought mental health or vision

treatment prior to 2013 simply to avoid the expert report requirements of Rule 26(a)(2)(B).  His treatment records with Dr. Plavin confirm ongoing treatment for a long-standing, mental problems of anxiety with severe depression and its related symptoms.

Barnes was not referred to Dr. Plavin by his current attorney, or apparently any attorney who may have represented him in his prior lawsuit against CSXT.  Indeed, as the treatment notes from September 9, 2008 indicate, Barnes spouse was upset with him at that time, as Dr. Plavin noted, because he "has no attorney."[104] Not until November 2008 did Barnes mention to the doctor that he met with an attorney from Buffalo according to Dr. Plavin's notes.[105] Nowhere is there any indication in Dr. Plavin's progress notes that (1) he was supplied with information or other materials by Barnes' current counsel in an effort to influence his decisions regarding diagnosis or treatment of his patient, or (2) that Barnes' counsel solicited any particular favorable opinions from the doctor in an effort to further Barnes' legal claims in the present lawsuit.  There also is no indication that Dr. Plavin relied on any post-treatment materials, i.e., books, videos, tests or other documents not relied on during his treatment as a basis for his opinions.

The anticipated expert testimony of Dr. Plavin set forth at pages 9-11 of Barnes' Supplemental Memorandum appears to the Court to be taken entirely and directly from the doctor's contemporaneous progress notes.  The Court's careful review of those same notes confirms that the numbered items of expert testimony set out at page 9 of the Memorandum are all conclusions that the doctor reached at the time of his treatment of Barnes.  As such they appear to fall well within the "permissive core" of psychological issues pertaining to treatment. CSXT certainly cannot persuasively claim unfair surprise, given that Barnes long ago also made the same treatment records available to it by way of a medical records release authorization.

---

[104] See footnote 48, *supra*.

[105] Id.

While Barnes as part of his psychotherapy with Dr. Plavin made repeated references to the procedural status of his prior federal lawsuit, there is simply no indication that, either the earlier lawsuit, or the present one, improperly influenced the doctor's professional conclusions about Barnes' mental condition or its causes.  It appears simply that Barnes was then relating the ongoing events of his life as part of his therapy sessions.  Accordingly, Barnes' recurring references to such litigation do not in the view of the Court call into question its conclusion that Dr. Plavin is not subject to the expert witness report requirements of Rule 26(a)(2)(B).  He will testify to his professional conclusions drawn from the facts as he observed them during the course of treatment, a circumstance that places his expert testimony well within the confines of Rule 26(a)(2)(C) and the treating physician exception.[106]

The remaining two expert witnesses are Craig Callihan, MRC, CRC, Vocational Rehabilitation Counselor, and Andre Ryssemus, MRC, CRC, Assistive Technology Specialist. Both men are state employees of the Commonwealth of Kentucky, employed by the Education and Work Force Development Cabinet, at the Office for the Blind located in Lexington, Kentucky.  The Court has examined Callihan's handwritten progress notes, as well as, the formal written reports generated by both men during their ongoing treatment of Barnes, all of which are set out above.  Those records confirm that Dr. Musick referred Barnes to the OFB after Barnes expressed interest in learning to drive an automobile with the use of a bioptic assistive device and of possibly returning to work at CSXT.  Dr Musick also performed various vision tests requested by CSXT during Barnes' unsuccessful attempt at re-employment.

Dr. Musick provided the OFB with Barnes' vision treatment records, which Callihan summarized in his hand-written notes dated July 7, 2011.  Callihan's notes confirm that after

---

[106] Whether the 4-year gap in treatment from 2011 to 2014 affects Barnes' credibility as it relates to his subjective symptoms is an entirely different issue, one unrelated to the present issue about expert witness reports under Rule 26.

Barnes applied for re-employment at CSXT Callihan began to work with Fred Crane, a CSXT

vocational rehabilitation counselor who provided the OFB employees with an explanation of the

visual requirements of the job of Yardmaster at the Osborne Yard in Louisville.  Callihan's notes

reflect that Crane directly requested Callihan's opinion on whether Barnes had the ability to

adequately see the computer monitors that the Yardmaster must use.  In response to this request,

Callihan, in his notes, reflected that he and his OFB co-worker Ryssemus would need to examine

the work environment of the Yardmaster to determine what assistive technology to recommend

and to determine whether it would enable Barnes to perform the duties of Yardmaster.

      These notes confirm, first, that Barnes' attorney played no role whatsoever in the

involvement of the OFB with Barnes.  The referral was entirely the work of Dr. Musick made in

response to Barnes' own request.  Second, they show that CSXT's representative, Crane, raised

the issue of Barnes' visual ability to perform the duties of the Yardmaster position, an issue that

he discussed with Callihan during their conference call on August 6, 2012 when Crane advised

that the job would involve the use of 3-4 computer monitors.  Likewise, Crane is the individual

who requested that Barnes take a vision color test and vision field test, a request that led Callihan

to contact Dr. Musick to arrange for him to administer the tests.  Accordingly, Barnes attorney

played no role in raising or resolving the issue of whether Barnes could perform the essential

functions of the Yardmaster position with reasonable accommodation.

      The entire question arose between the OFB employees in the course of performing their

statutory duties under KRS 163.470 and Crane, acting as CSXT's own representative in the

matter.  There is simply no indication that Barnes' attorney had any involvement whatsoever in

these events, the subsequent joint inspection of the Osborne Yard on September 20, 2012 or the

resulting reports prepared by Callihan and Ryssemus, who were simply performing "services as

needed for blind adults" including "industrial evaluation, training and employment" services. See KRS 163.470(10) and (12). Their reports, the Assistive Technology Services Evaluation Report of October 8, 2012 and the letter report of February 11, 2013, appear to the Court to come directly from their observations at the Osborne Yard and from their testing of various assistive devices with Barnes that January to determine his ability to adequately view the computer monitors and discern the various colors appearing on them. The conclusions contained in both documents are the basis for the anticipated opinion testimony of both men, as set forth in the Supplemental Memorandum at pages 4-5, along with the factual basis for the opinions and specific citations to various records in support of such conclusions.

Once again all of the *Fielden* factors align in favor of the Plaintiff. Callihan and Ryssemus reached their conclusions at the time that they rendered OFB services to Barnes, not afterwords, nor with any involvement of counsel. The conclusions – – that Barnes is capable of performing the duties of Yardmaster with various assistive technology – – should come as no surprise to CSXT, given that the same conclusions were directly communicated to its representative, Crane and his boss, Dr. Nielsen, at the time, and CSXT has been provided with access to all of the written progress notes and reports made by Callihan and Ryssemus.

No indication exists that either man relied on anything other than his professional training in reaching the conclusions contained in their reports. Further, their communications with Dr. Music, and reliance on the various test results provided to them by the doctor, fall entirely within the scope of their statutory duties, as both men explained in their February 11 letter acknowledging that neither of them was a trained optometrist. In other words, the coordination between the OFB and Dr. Music provides no support for CSXT's claim that the OFB relied on tests, documents, books, book videos are other sources "not relied upon during treatment."

*Hinkle*, 2013 WL 1992834 at *2 (citing *Gaspar v. Dicks*, No. 08–13707, 2011 WL 5975061 (E.D.Mich. Nov. 29, 2011).  Because both Callahan and Ryssemus will testify within the permissive core of issues pertaining to their rehabilitation treatment efforts, and what they learned through those same efforts, they also are subject to the treating physician exception of Rule 26(a)(2)(C) and therefore are not required to produce full expert witness reports.

## C.

In this final portion of its Order, the Court addresses the various arguments and case authorities raised by CSXT in its motion papers and summarized in section III A of the present Order.  Review of these arguments and decisions repeatedly reveals that they are either unsupported by the facts of record or, in the case of the cited judicial authority, readily distinguishable from what has occurred in the present dispute.  For these reasons, the Court as explained below rejects all of CSXT's arguments in support of its motion to strike.

The fundamental view of CSXT from the outset is that the long-standing professional relationship between Barnes and his four expert witnesses, along with the fact that none of them have been paid by Barnes in return for their testimony, are circumstances that somehow are irrelevant, as opposed to being solely determinative.  Nothing could be further from the truth.  While the absence of payment for testimony, or the existence of a pre-existing professional relationship, standing alone, might not turn the issue *if* other key facts indicated that a witness had been retained or specially employed, the presence of both such factors in this case cannot simply be dismissed summarily.  Both factors remain critical to the analysis, along with the substance of the anticipated expert testimony.  The efforts of CSXT to waive aside the fact that Barnes had a pre-existing professional relationship with each of the witnesses that arose in most instances years prior to the filing of the present lawsuit, and occurred without any involvement of

Barnes' current attorney, is powerful evidence in favor of the conclusion that Rule 26(a)(2)(B) simply is not applicable here.

CSXT also is critical of the August 4, 2012 summary report disclosure made by Barnes, apparently for two reasons.  First, CSXT claims that this disclosure contains merely the bald legal conclusion of each witness that – – Barnes remains capable of performing the essential functions of the Yardmaster job position with reasonable accommodation.  Such purely legal conclusions according to CSXT are an improper basis for expert testimony because they invade the province of the jury.  Second, CSXT insists that the anticipated opinions of the expert witnesses set forth in the Supplemental Memorandum are in conflict with the August 4 disclosure.

The Court disagrees on both accounts.  As Barnes points out, the Magistrate Judge ordered him to provide in his Supplemental Memorandum a detailed disclosure of all anticipated opinions and the factual basis for such opinions for each expert witness.  Barnes fully complied with this Order.  The provisions of Rule 26(a)(2)(C), and the 2010 Advisory Committee commentary that accompanies it, make no such requirements.  In other words, Barnes in August 2012 was not required in any fashion to set out in explicit detail all of the anticipated testimony and opinions of his expert witnesses. Fed.R.Civ.P. 26(a)(2)(C), Advisory Committee Notes,2010 Commentary ("This [summary] disclosure [under subdivision (a)(2)(C)] is considerably less extensive than the report required by Rule 26(a)(2)(B).  Courts must take care against requiring undue detail, keeping in mind that these witnesses have not been specially retained and may not be as responsive to counsel as those who have.") Therefore, it is hardly surprising that the initial August 4 summary report does not include all of the various opinions found at pages 2-10 of the Supplemental Memorandum, nor does the Court view the initial disclosure report as being

inconsistent or otherwise contrary to the substance of the anticipated opinion testimony set forth in the Supplemental Memorandum.  Any variance is entirely attributable to the different standards at play when each document was created by Barnes in 2012 and 2016 respectively.

As for factual testimony concerning the ability of Barnes with various assistive technology to perform the duties of the Yardmaster position, such testimony is entirely appropriate particularly with regard to expert witnesses Callihan and Ryssemus, whose statutorily imposed duties under KRS 163.470(12) are to provide industrial and work evaluation to legally blind Kentuckians.  Indeed, Callihan's job title with the OFB is "Vocational Rehabilitation Counselor, and Ryssemus is an "Assistive Technology Specialist" for the blind.  If these two expert witnesses cannot appropriately testify to whether Barnes is able to perform the essential functions of the Yardmaster job position with reasonable accommodation in the form of the assistive technology they specifically tested with Barnes, then it is doubtful that any expert witnesses would be qualified to render such an opinion.

The Court does not disagree with CSXT that, given the case law interpreting Federal Rule of Evidence 704(a), an expert witness could not, without providing any factual support, appropriately testify solely to the ultimate legal conclusion in an ADA action.  There is ample case law to support this basic black law proposition.  *See Orner vs. National Beef Packaging Company, LLC*, No 4:13-CV-0837, 2015 WL 8334544 at *8 (M.D. Pa.  Dec. 9, 2015) ("In the context of ADA litigation, several federal courts have applied Federal Rule of Evidence 704 to exclude expert testimony offering direct legal conclusions about such ultimate issues as whether a plaintiff "was disabled or impaired" and whether a defendant "failed to engage in a meaningful interactive process;" "engaged in discriminatory practices with reckless indifference;" or provided "a reasonable accommodation.")(foot notes omitted). *See gen.*, *Steffy v Cole Vision*

*Corp*, No. 05-C-0204, 2008 WL 7053517 at *2 (E.D. Wis. Jan. 9, 2008)("Under the ADA, an individual is "disabled" if she has a physical or mental impairment that substantially limits one or more of her major life activities. See 42 U.S.C. § 12102(2). Whether a condition constitutes a disability under the ADA is a legal conclusion that requires a three-step inquiry by the court.").

None of the current expert witnesses' anticipated expert testimony, as described in the Supplemental Memorandum, however, runs afoul of Rule 704(a), which is not in any event the true focus of the present proceedings, as opposed to Rule 26(a)(2)(B) and (C).  To the extent that CSXT remains critical of the summary report disclosures of August 2012, more current developments such as the Supplemental Memorandum have substantially alleviated its evidentiary concerns.

The Court turns now to *Charles v. Print Fulfillment Services*, No 3:11-CV-553-H, 2014 WL 169666 (W.D. Ky. Jan. 13, 2014), a decision that CSXT repeatedly urges is controlling. *Charles* involved an action for age discrimination brought by Keith Charles, a former employee of the defendant, Print Fulfillment Services, which employed him as its company controller.  *Id.* at *1.  Essentially, Mr. Charles alleged that Print Fulfillment fired him from the controller position after he complained about its violations of immigration and tax laws.  *Id.*  Prior to trial, Charles identified four expert witnesses that included himself, another former Print Fulfillment employee, an accountant Erica Johnson, and Thomas Perryman, an agent of the US Immigration and Customs Enforcement agency who had conducted a prior investigation of Print Fulfillment's employment records.[107]  Charles provided only summaries of the expected testimony of these experts, instead of full expert reports, based on the theory that none of these experts had been

---

[107] The fourth expert witness, the accounting firm of Mountjoy, Chelton & Medley, LLP, provided a Rule 26(a)(2)(B) expert report and thus was not involved in Print Fulfillment's motion to compel expert reports.

retained or specially employed by him.  *Id*. These events led Print Fulfillment to move to compel Charles to provide full expert reports for himself, Johnson and Perryman.

The Court agreed with Print Fulfillment as to two of the witnesses, Charles and Johnson, but disagreed as to Agent Perryman.  *Id*. at *2-3.  The Court reasoned that both Charles and Johnson were witnesses who would offer opinion testimony developed specifically during the litigation by their post-employment review of "Print Fulfillment's records, depositions of its employees and other documents produced during discovery."  *Id*. at *2.  As a result, they were subject to the expert witness report requirements of Rule 26(a)(2)(B). Agent Perryman, on the other hand, would testify based on his own recollection of facts uncovered during his investigation, and would address "whether the documents generated during the investigation establish that Print Fulfillment violated any laws during the time period investigated" given his specialized knowledge as an ICE Agent.  *Id*. at *3.  Accordingly, the Court concluded that Perryman fell within the treating physician exception such that no expert report was required.

CSXT now urges the Court to put Barnes' four expert witnesses in the category of Charles and Johnson, rather than Agent Perryman.  The Court disagrees based on the facts of record in this case.  The expert witnesses identified by Barnes all fall far closer to the circumstances of Agent Perryman than to either Charles or Johnson.  For example, OFB employees Callihan and Ryssemus, as such, acted throughout pursuant to their statutory duty to provide industrial evaluation to the blind in Kentucky.  In other words, they employed their specialized knowledge and training to assist Barnes in his efforts to obtain re-employment.  Their conclusions are specifically based on their own observations and actions, and not on any subsequent review of CSXT's records.  If anything, *Charles v. Print Fulfillment Services,* therefore is strongly supportive of Barnes' position particularly as to these two hybrid experts.

43

Doctors Plavin and Musick, unlike the *Charles* decision, have not been identified as expert witnesses to testify on whether the conduct of CSXT is lawful under the ADA.  Rather, as the Supplemental Memorandum indicates both professionals are testifying directly from their actions and observations during their treatment of Barnes with their contemporaneous opinions falling easily within the permissive core of their professional training.  Neither man relies on any after-the-fact review of CSXT's records as the basis for his opinions identified in the Supplemental Memorandum.  Thus, we cannot agree with CSXT that *Charles* dictates any outcome different from what the Court has now reached.  Finally, the Court would be remiss if it did not note that the *Charles* decision by its own language partially undermines its persuasive force by its explicit concession that the Court therein was possibly erring on the side of caution in its result.  The fact that the decision also contains no citations to, or a discussion of, any federal case law, while not necessarily determinative, certainly is not a consideration that lends additional confidence either.

The next matter involves the argument of CSXT that, because Barnes at one time considered hiring a retained expert to testify to the same opinions, but elected not to do so, his decision was some form of concession that the nature of such testimony is limited somehow to retained experts.  CSXT cites no published federal case law that supports this unusual proposition, which rests on a fundamental error of logic.  In other words, merely because a retained expert might properly testify to the same opinions as a non-retained expert does not, as a matter of logic, compel the conclusion that the proffered opinions may only be offered by retained experts, as opposed to individuals who fall within the treating physician exception of Rule 26(a)(2)(C).

Federal Rule of Civil Procedure 1 expressly encourages the administration of the civil rules so as to "secure the just, speedy, and inexpensive determination of every action and proceeding." Fed.R.Civ.P 1.  The desire of Barnes to avoid what he believes to be unnecessary retained expert witness fees, where the very same opinions in his view may properly be offered by non-retained experts under the treating physician exception to Rule 26(a)(2)(B), is nothing extraordinary, but rather merely a logical, economic decision, one entirely in accord with the fundamental policy that underlies the Federal Rules of Civil Procedure.  Certainly, Barnes did not and has not attempted to advocate for any "poverty exception" to the expert witness report requirements of Rule 26(a)(2)(B) as CSXT errantly claims.  Accordingly, we reject this argument as well.

The Court also rejects the suggestion by CSXT that Barnes has attempted in some fashion to create a "government employee" exception to Rule 26(a)(2)(B) based on arguments raised in his Supplemental Memorandum.  CSXT misstates the nature of Barnes' arguments in this respect.  Barnes does not claim that government employees in the performance of their official duties cannot be retained experts.  His views on the matter are far more nuanced.

Essentially, Barnes makes two important points.  First, he points out that neither he nor his counsel could have contracted directly with Callihan, Ryssemus or the OFB to determine whether he could perform the duties of the Yardmaster position with assistive technology.  By statute, KRS 163.480, the OFB is required to contract with nonprofit corporations and therefore could not contract with Barnes or his attorney to provide him with the services of Callihan or Ryssemus.  Second, Barnes points out that Callihan or Ryssemus, far from acting at the request of his counsel, were statutorily obligated via KRS 163.470(12) to provide the vocational rehabilitation and assistive services that they did provide to Barnes in 2011, 2012 and 2013.

Therefore, the two official reports they generated were in pursuit of their statutory duties and not at the request of Barnes' counsel or Barnes.  Both of these points are entirely valid and persuasive.  In contrast, the strawman argument of a "government employee" exception is just that.

Another problematic argument raised by CSXT is its claim pursuant to *R.C. Olstead, Inc v. CU Interface, LLC*, 606 F.3d 262, 271 (6th Cir. 2010) that without full expert witness reports under Rule 26(a)(2)(B) it will be "ambushed" at expert depositions, which should be preceded by expert reports to prevent unfair surprise.  This argument unfortunately begs the question at issue as it implicitly assumes a requirement for expert witness reports.  The key question of initial importance here is whether Barnes is required to have his expert witnesses provide such reports in the first instance.  Until that question is resolved, one cannot argue that such reports must precede expert depositions without assuming away the very issue under review.  Where expert reports are not required, such as when the treating physician exception applies, then depositions are the appropriate tool to flesh out the nature of the opinions of the expert witness.  Because the Court has determined that all four hybrid experts readily fall within the treating physician exception, *R.C. Olstead, Inc* does not alter the Court's ultimate conclusion that the motion to strike must be denied.

Neither *Widhelm v. Walmart Stores, Inc*. 162 F RD 591, 592 (D Neb. 1995) nor *Mohney v. USA, Hockey, Inc.*, 300 F.Supp.2d 556, 561 (N.D. Ohio 2004) is particularly helpful in advancing CSXT's position in the matter.  Both of these judicial decisions are readily distinguishable based on their facts and procedural history.  *Mohney*, for example, involved a products liability action brought by an Ohio teenager who on May 21, 1995 suffered a devastating spinal injury that rendered him a quadriplegic while he was participating in a try-out

ice hockey camp in Toledo, Ohio. *Mohney*, 300 F. Supp.2d at 806. Dr. Ramnath was the treating ER physician at the hospital on the day of the accident in 1995. *Id.* at 810. At the time that the doctor treated the injured teen, he included a statement in his patient history that the boy was "playing hockey at approximately 11:00 this morning and was thrown face forward into the boards, striking his face against the boards." *Id.*

More than seven years later, long after Dr. Ramnath ceased treatment in 1995, he provided an affidavit in support of the paralyzed boy's lawsuit in which the doctor indicated at paragraphs 9-11 of the affidavit that, after subsequently reviewing a miniDV tape of the accident, "the accident is consistent with the history recorded in my records." *Id*. Dr. Ramnath was not identified by the Plaintiff as an expert witness. Mohney instead argued that the doctor, as a treating physician, could render opinions with respect to causation without being subject to the disclosure requirements of Rule 26(a)(2)(B). *Id.* Because there was no evidence that the doctor reached his conclusion as to causation during his treatment of Mohney in 1995, as opposed to seven years later when preparing the affidavit in December 2002, the Sixth Circuit held on appeal that it was reasonable for the district court to conclude the doctor was "rendering an expert opinion that was subject to disclosure requirements [of Rule 26(a)(2)(B)] and to exclude [paragraphs 9-11 of] his affidavit for failing to satisfy those requirements." *Id.* at 811.

We simply have no facts in the present lawsuit remotely similar to those of *Mohney*. Here, no extraordinary seven-year delay occurred between Barnes' professional treatment and the opinions of his four identified hybrid experts. None of their opinions appear to be the result of any post-treatment examination of a videotape or other information apparently provided by Plaintiff's counsel, as seems to have been the case in *Mohney*. Accordingly, if anything, *Mohney* is supportive of Barnes' arguments by its contrasting facts.

*Widhelm* is no more compelling a judicial decision given its troubled procedural history. In *Widhelm*, the Plaintiff alleged that she was injured in June 1993 while inside a Walmart store located in Indiana. *Widhelm*, 162 F.R.D. at 592. During litigation, Plaintiff's counsel failed to timely comply with the scheduling order that required the Plaintiff to provide a statement regarding each expert witness that she expected to call at trial on or before January 1, 1995. After the deadline expired, the Plaintiff attempted to identify three of her treating physicians as expert witnesses who would testify, among other things, as to the causation of her injuries and her permanent disability rating. *Id*. Plaintiff filed a motion for extension of time in which to designate expert witnesses based on a supposedly new issue involving her eyesight, but failed to support her motion with any legal brief or affidavit. *Id.* Plaintiff also moved to conduct the depositions of her treating physicians out of time after the deadline for completion of discovery had expired. *Id.* at 593.

The Court concluded pursuant to the good cause requirement of Rule 16(b) that the Plaintiff in *Widhelm* was not entitled to relief from the deadlines of the order. In doing so, the judge was moved to comment that a "scheduling order 'is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril.'" *Id* (citing *Gestetner Corp. v. Case Equip. Co.,* 108 F.R.D. 138, 141 (D.Me.1985)). The Court also declined Plaintiff's efforts to argue that the footnote to the scheduling order, that deemed that treating physicians were not considered to be retained or specially employed to provide expert testimony, provided refuge for counsel's untimeliness because "plaintiff has expanded that [treating physician] role and is attempting to solicit expert testimony about causation and the plaintiff's permanent disability rating that will not be permitted. The treating physicians will only be

48

allowed to testify about their treatment of plaintiff and the fairness and reasonableness of their bills." *Id*. at 594.

Here, Barnes has not violated the amended scheduling order entered by the Court. He has not filed an unsupported motion for relief after the expiration of the scheduling order deadline for completion of discovery. These procedural circumstances alone materially distinguish the present case from *Wilhelm* given its extremely critical commentary on the litigation conduct of Plaintiff's counsel.

More importantly, the passing comment of the judge in *Wilhelm* that appears to suggest, without citation to any supporting authority, that a treating physician may not testify as to causation is a proposition directly contrary to, not only the majority view on this issue in the federal courts, but the express language of *Fielden* as discussed in depth above. In this Circuit, and indeed throughout the federal court system, a treating physician may testify without providing an expert witness report on his or her opinions concerning causation so long as such opinions fall "within a permissive core on issues pertaining to treatment, based on what he or she learned through actual treatment and from the plaintiff's records up to and including that treatment." *Fielden*, 482 F.3d at 871. Any passing contrary suggestion found in *Wilhelm* is singularly unpersuasive.

Nothing prevents a treating physician from testifying to questions of causation. The only requirements are that the opinion of the treating physician on the issue was developed during and related to the treatment of the party and is based upon the physician's ordinary medical or other professional training. If these conditions are met, the expert witness may properly be considered to fall within the treating physician exception of Rule 26(a)(2)(C) as to his or her causation opinion testimony.

To the extent that CSXT seems to try to carve out a causation exception as being somehow excluded from the opinion testimony that a treating physician may properly give without providing an expert report, CSXT ignores the overwhelming majority of federal case law to the contrary. *Martin v CSX Transp., Inc*, 215 F.R.D. 554, 556 (S.D. Ind. 2003)(" The majority of courts permit physicians to present their opinions formulated during the course of treating a patient."). *See gen*. Christopher W. Dyer, Note, <u>Treating Physicians: Fact Witnesses or Retained Expert Witnesses in Disguise? Finding a Place for Treating Physician Opinions in the Iowa Discovery Rules,</u> 48 Drake L.Rev. 719, 730–31 (2000) (only a "small minority of federal courts addressing the treating physician issue have held that treating physicians who have not presented the detailed report, as required of retained experts, are prevented from providing testimony regarding causation and prognosis."). Accordingly, *Widhelm* is not only procedurally distinguishable, its passing dismissal of causation testimony by treating physicians who do not provide expert reports is contrary to the decided majority view in the federal courts.

The final matter to be discussed is what the Court characterizes as the "moving target" argument of CSXT, which is that Barnes has attempted improperly to reserve unto himself the inalienable right to have his four expert witnesses present additional, presently unknown, opinions derived in the future.  Some factual background is necessary to understand the argument.

After Callihan and Ryssemus met with Fred Crane and Don McCog at the Osborne Yard on September 20, 2012 to inspect the various Yardmaster workstations, CSXT apparently modified, or otherwise altered, the physical layout of one or more of those three tower workstations so that additional examination is now required by Callihan and Ryssemus in order to determine if their professional evaluation remains unaltered, given the new work environment

at the Yard.  Barnes in his motion papers explains that he has been attempting without success to obtain permission from CSXT for several years now to have the OFB employees return to the Osborne Yard for further evaluation.

The other matter relates to the CSXT Yardmaster training program located at Atlanta, Georgia.  Callihan's notes indicate that the OFB employees would need to see the Atlanta facility to determine the visual requirements for Barnes should CSXT agree to re-hire him as Yardmaster.  Barnes apparently continues to seek to have Callihan and Ryssemus travel to the Atlanta facility for the purpose of evaluating the Yardmaster computer training equipment in light of Barnes' visual limitations and the assistive technology available to him.  These circumstances are what may potentially affect matters related to the four expert witnesses.  These circumstances, however, certainly do not render their currently identified opinion testimony a "moving target."

CSXT will have available the same means by deposition to flesh out any potential additional expert testimony should the requested inspections go forward at some point in the near future.  Additionally, Barnes apparently has offered to provide an expert report to this limited extent, an offer which the Court does not view as a concession, but rather simply as a means to expedite the progress of this long-standing litigation.  Accordingly, this final argument in the view of the Court is no more sound, as a basis to grant the motion to strike, than any of the other arguments rejected above.

**CONCLUSION**

The Court complements Barnes and CSXT on the quality of their motion papers, as well as their patience in this important matter.  While CSXT has raised a number of artful arguments, the facts of record simply do not support them, nor do the cited cases afford a compelling basis for the extraordinary relief requested.  Simply put, in this instance, reality is rebuttal.  The reality of the situation is that a careful review of the progress and treatment notes of the four designated expert witnesses repeatedly demonstrates that their opinion testimony easily falls within the permissive core of Barnes' treatment and was arrived at during that treatment without any involvement or urging by Plaintiff's counsel.  Consequently, because the identified opinion testimony and factual basis set forth in the Supplemental Memorandum and the initial summary expert report disclosure are more than adequate to satisfy Rule 26(a)(2)(C), the motion to strike is **DENIED** in its entirety.[108]

---

[108]  Appeal of this order is subject to the terms and time limitations of Rule 72(a) of the Federal Rules of Civil Procedure.